## GEO. W. MARTIN v. JOHN FRANCIS, *State Treasurer, &c.*

PUBLIC MONEYS; *Legislative Appropriation.* Money belonging to the state, rightfully in the State Treasury, and over which the legislature has the rightful control, cannot be drawn from the state treasury except in pursurance of some act of the legislature passed for that purpose within one year prior to the attempted drawing of the money.

### *Original Proceeding in Mandamus.*

THIS was an amicable action, instituted in June, 1874, at the instance and under the direction of Ed. Russell, State Superintendent of Insurance, as a test case. *Martin* was only a nominal plaintiff. Section 17 of the act creating the Insurance Department, (ch. 93, laws of 1871,) provides that insurance companies doing business in this state shall pay certain fees to the superintendent of insurance, and that "all said fees shall be paid by the superintendent into the state treasury for an *insurance fund*, and shall be used for the purpose of defraying the expenses of the insurance department, and

for no other purpose whatsoever." And § 4 of said act provides that "All the salaries, payments and expenditures for said insurance department, shall be paid by the treasurer of state upon the certificate of the superintendent, in the same manner as other like expenses, *provided,* the amount so paid out shall at no time exceed that collected from the insurance companies and paid into the state treasury as provided in this act." Said act (§§ 2 and 4,) provided for the payment of an annual salary to the superintendent, and to a chief clerk, authorized the appointment of other clerks as occasion might require, and authorized the superintendent to furnish suitable rooms at the capital for the department, and to provide the necessary furniture, stationery and other conveniences for the transaction of the business of his office. Said act did not make nor pretend to make any specific "appropriations" out of the "insurance fund," or otherwise, for the expenses of the department, nor were such appropriations made by any other act for 1871, nor for the year 1872; but the entire expenses for both those years were paid by the state treasurer out of the "insurance fund" upon warrants drawn by the superintendent under the authority given by § 4 of said insurance law, above quoted. In 1873, (laws of 1873, p. 60,) the legislature passed an appropriation bill for the expenses of the insurance department for that year. In 1874 the ways-and-means committee refused to report a bill making appropriations for the insurance department. An amendment making such appropriations was offered in the senate to the bill "making appropriations for the executive and judiciary departments," and was adopted, but the house refused to concur, and the senate receded; (Senate Journal, 1874, pp. 476, 480, 481; House Jour., 911, 912.) The affidavit for the mandamus in this case, alleged, that *Martin* was state printer; that as such officer he had done certain printing which was necessary for the transaction of the business of the insurance department; that such printing had been ordered by the superintendent of insurance, and his bill therefor had been audited and allowed by said superintendent, and that said

superintendent had issued to him a warrant on the state treasurer for $43, the amount of said bill, payable out of the insurance fund; that he presented said warrant to *John Francis*, state treasurer, for payment, on the 22d of June 1874; that there was at the time of such presentation more than two thousand dollars in said state treasury belonging to the insurance fund; and that said treasurer refused to pay said warrant, assigning as a reason for such refusal that "no appropriations had been made by the legislature of 1874" for the payment of insurance warrants. The affidavit stated that the state treasurer had and made no other legal or valid excuse for refusing to pay said warrant—that no appropriation was necessary to authorize such payment, and praying for a writ of mandamus, etc. The Attorney-General appeared for the State Treasurer, waived process, and demurred to the affidavit. The case was heard at the July Term.

*A. L. Williams*, Attorney-General, in support of his demurrer, and against the allowing of a writ of mandamus, contended —

1st, That the insurance law, (§ 4, ch. 93, laws of 1871,) did not give the superintendent of insurance any legal right to issue *warrants* on the state treasury for the payment of money, but merely to "certify" the expenses of his department to the auditor, and that the auditor should issue the proper warrants; (§ 29, ch. 102, Gen. Stat.)

2d, Sec. 17 of the insurance law requires the superintendent to pay "into the state treasury" all the fees, etc., collected by him; they are therefore rightfully and legally in the state treasury, and "public moneys."

3d, Section 24 of art. 2 of the state constitution expressly declares that "no money shall be drawn from the treasury except in pursuance of a specific *appropriation* made by law."

4th, If no "specific appropriation made by law" is necessary, then the plaintiff has a plain and adequate remedy at law, namely, an action against the defendant to recover the

amount of the warrant by reason of defendant's refusal to pay it on presentation.

*W. C. Webb*, for the plaintiff:

1. The "warrant" was properly issued by the superintendent of insurance. The insurance act (§ 4) declares that the expenses of the department "*shall be paid by the treasurer on the certificate of the superintendent.*" The *form* of the paper called a "warrant" is sufficient; and whether called a "certificate" or a "warrant," its legal effect is the same, and just what the legislature prescribed. The constitution creates the office of "auditor," but does not prescribe or even designate the character of his duties. But the word "auditor," *ex vi termini*, imports "an officer appointed and authorized to examine accounts, compare charges with vouchers, allow or reject charges, and state the balance." It is a novel feature in our legislation, (§ 30, ch. 102, Gen. Stat.,) which devolves upon the "auditor" the authority to *issue* warrants, (and more novel still (§ 33 of said ch. 102,) to require that they be "countersigned" by the officer whose duty it is to *pay* them.) But in the absence of constitutional inhibitions, the legislature could devolve, and in some cases has devolved, on the "auditor" new and extraordinary duties not usually covered by the word "auditing." The legislature has made the secretary of state (ch. 28, § 13, laws of 1869,) *the auditor* of all accounts against the state for public printing. His certificate is conclusive, and the "auditor of state" has no duty with respect to the accounts of the state printer, except to "draw his warrant" for the amounts allowed (audited) by the secretary of state. So too the legislature has made the superintendent of insurance *the auditor* of accounts and claims on account of the insurance department; and with respect to such expenses the superintendent (and not the auditor of state) is authorized to draw warrants on the state treasurer; and the reasons are quite as strong why the particular duty of "issuing warrants" should be divided between the auditor and superintendent, as those which induced the legislature to divide the proper duties

of an "auditor" between the auditor of state and the secretary of state.

2. "There was no appropriation made in 1874 for the payment of this class of warrants." Is an annual specific *appropriation*, by law, necessary? It is respectfully submitted that it was not necessary. The constitutional provision referred to by defendant (sec. 24, art. 2,) does not cover any funds in the state treasury except such as are raised by "taxation," that is, pursuant to the general laws of the state for an annual and uniform assessment and taxation of property. Said § 24 should be read in connection with §§ 1, 3 and 4 of art. 11—thus:

ART. 11.—"SEC. 1. The legislature shall provide for a uniform and equal rate of assessment and taxation. * * *

"SEC. 3. The legislature shall provide, each year, for raising revenue to defray the current expenses of the state.

"SEC. 4. No tax shall be levied except in pursuance of a law, which shall distinctly state the object of the same, to which object only such tax shall be applied."

ART. 2.—"SEC. 24. No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law; and no appropriation shall be for a longer term than one year."

Reading and construing these sections together—and being *in pari materia* they should be so construed, without regard to their particular location in the constitution—and it is very clear that the "moneys" in "the treasury" which cannot be drawn except in pursuance of an annual "specific appropriation," are the general "revenues" raised annually as "state taxes" to defray the current expenses of the state by an uniform and equal rate of assessment and taxation of all taxable property, real and personal. Placing said § 24 in the "legislative" article, and omitting from the article on "finance and taxation," cannot give a broader scope to its language. The legislature has never but once (ch. 25, laws of 1873,) deemed it necessary to make a "specific appropriation" of moneys other than that raised by taxation as general "revenue," while it has on several occasions indicated that such moneys in the state treasury may be drawn therefrom *without* "a spe-

cific appropriation made by law." In 1866, (laws of 1866, p. 142; Gen. Stat. 1868, p. 888,) the legislature passed an act "providing for the sale of public lands to aid in the construction of certain railroads." By this act (§§ 3, 4, 5,) the office of "state agent" to sell said lands was created, such agent to hold his office "until all said lands shall be sold," subject to removal by the governor, and to "have a salary of $1,500 per annum *payable out of any moneys arising from the sale of said lands.*" The same section (§ 5) which fixes the salary provides that said agent "shall deposit all moneys, derived from any sale, with the treasurer of state," and that his (the agent's) "salary shall be paid quarterly upon a warrant drawn by the auditor upon the treasurer." Said § 5 has never been repealed, nor amended. Said office of state agent still exists, and has had an imcumbent nearly all the time for eight years past, and now has an incumbent, who has drawn his salary quarterly "upon warrants drawn by the auditor upon the state treasurer," and yet the legislature has *never* at any time made a specific appropriation, nor any "appropriation," for the payment of said salary.* The insurance law does not stand alone in this respect. It requires the payment by insurance companies of certain specific "fees," (not *taxes* upon an equal and uniform assessment of *property*,) and that such fees shall be paid into the state treasury to constitute a fund for the payment of the expenses of the insurance department, "and for no other purpose." Such fees constitute no part of the "revenue" raised for the "current expenses of the state," (that is, for *all* the ordinary expenses of the government,) and is not subject to the constitutional provision requiring an annual specific appropriation to draw it from the treasury. The general revenues levied and collected as "state taxes," go into the state treasury as a "general fund," no part of which can be paid out with a specific designation of *the amount* and *the purpose*, (denominated an "appropriation,") as, so many dollars for salaries of the governor and other state officers; so many dollars for salaries for

[* A SIMILAR feature exists in chapter 104, laws of 1874, §5.—REPORTER.]

the judges of the several courts; so many dollars for per diem and mileage of the members of the legislature; so much to maintain one charitable or educational institution, and so much for another; and so much to erect the state capitol, or a new asylum, and the like. This is what is meant by a "specific appropriation"—a legislative enactment designating from the "general fund" a particular amount for a particular purpose, to be drawn from the treasury within a year for such purpose, or not at all. The "insurance fund," like the "railroad fund," is raised in a particular and unusual manner— the one by fees, the other by the sale of lands. It is raised for a particular object, and deposited for that particular object, "and for no other purpose," and the expenses of that particular object are limited to the amount so raised, so as not to touch or disturb the general revenues of the state. It is "specifically appropriated" when raised, and does not require another legislative enactment to authorize its application to the payment of insurance warrants. If the insurance law had provided that the superintendent should collect the fees, pay the salaries and other expenses of the department, and deposit the surplus, if any, in the state treasury at the close of the fiscal year, and publish in his annual report a statement of the fees collected, expenses paid, and amount deposited, the validity of the law would not be questioned. To require the superintendent to pay the fees into the state treasury first, and then authorize him to draw them out on his warrants issued for salaries and expenses of the department, does not change the character of the fund, so as to subject it to the constitutional provision under consideration.

3. The "plain and adequate remedy in the law," suggested by the defendant, is not such a remedy as will defeat or prevent a mandamus. Here the defendant is a public officer, and in his official capacity he holds moneys collected for the particular purpose of paying this warrant, and other warrants of this class. His duty to pay this warrant out of such fund results from his office, and it is a duty which he may be compelled to perform at any time. The plaintiff will not be

driven to an action against the officer and his sureties for an omission or refusal to perform such duty, but may have his relief by a mandamus compelling its performance.

The opinion of the court was delivered by

VALENTINE, J.: This is an action of mandamus brought originally in this court. There are several questions involved in the case, but for the purposes of the case we shall assume that all except one should be decided in favor of the plaintiff, and that one may be stated as follows: Can any money belonging to the state, rightfully in the state treasury, and over which the legislature has the rightful control, be drawn from the state treasury except in pursuance of some act of the legislature passed for that purpose within one year prior to the attempted drawing of the money? We must answer this question in the negative. The question arises as follows: The superintendent of insurance issued a warrant in favor of the plaintiff upon the state treasurer, which warrant reads as follows:

"INSURANCE FUND,           INSURANCE DEPARTMENT,
    No. 196.           TOPEKA, March 10th, 1874.
*Treasurer of State of Kansas:*
Pay to Geo. W. Martin, or order, the sum of forty-three dollars, out of any moneys in the State Treasury belonging to the 'Insurance Fund,' as provided by Chapter 93 of the Laws of 1871.   [SEAL.]         ED. RUSSELL,
   $43.00.           *Superintendent of Insurance.*"

The plaintiff presented this warrant to the state treasurer for payment, and the state treasurer refused to pay the same, and indorsed thereon the following words, to-wit:

"Presented for payment June 22d, 1874. Not paid, for the reason that no appropriation was made by the legislature of 1874 providing for the payment of this class of warrants.
           "JOHN FRANCIS, State Treasurer."

Now, admitting that everything must be decided against the treasurer except that the legislature failed to make an appropriation for this class of warrants, and then should the treasurer have paid said warrant? We think not. Section

24 of article 2 of the constitution reads as follows: "No money shall be drawn from the treasury except in pursuance of a specific appropriation made by law; and no appropriation shall be for a longer term than one year." This section would seem to be decisive of the question now under consideration. "No money shall be drawn," etc. This would seem to mean that no money that may ever rightfully be in the state treasury shall be drawn therefrom except in pursuance of an act of the legislature specifically authorizing the same to be done, passed within one year prior thereto; and it certainly does mean so unless some other provision of the constitution may be found which would tend to limit or modify the meaning of the language used. Now, we shall not say that there is nothing in the constitution which would tend to limit or modify the meaning of said language; but we think there is nothing in the constitution that would tend in the least to limit or modify the meaning of said language so far as it has any application to this particular case. The language of said section is broad enough to cover the insurance fund as well as every other fund, and there is nothing in the constitution that we are aware of that would tend to withdraw the insurance fund from its operation. Hence the provisions of said section must apply to the insurance fund, whether they apply to every other fund or not. It seems to be admitted by all parties that said insurance fund belongs to the state, and that it is rightfully in the state treasury. Indeed, this action of mandamus against the state treasurer to compel him to pay a warrant drawn on the state treasurer for money in the state treasury is founded upon such a theory. It is claimed, however, by the plaintiff that the words "no money" as used in said § 24 should be construed to mean "no money raised by taxation." But if the framers of the constitution had intended to have given to said words such a meaning we think they would have said so in express terms; or at least they would have placed said § 24 in the article on finance and taxation (art. 11,) instead of placing it where they did. The state may and does receive money from various other sources than

that of taxation; and said section being isolated as it is, and broad in its terms, was undoubtedly intended to apply to all money raised from every source except such money as may be excepted from the provisions of said section by some other provision of the constitution. As said § 24 was not inserted in the article of the constitution concerning finance and taxation, it would certainly be as reasonable to say that it did not apply to money raised by taxation as to say that it does not apply to the insurance fund. But is not the "insurance fund" raised by a species of *taxation?*

The writ of mandamus will be denied, and judgment will be rendered for the defendant for costs.

All the Justices concurring.